Gary Chazen, a former officer and shareholder of Knox Metals Corporation ("Knox Metals"), appeals from the trial court's order denying his motion to compel arbitration of the fraud and breach-of-fiduciary-duty claims filed against him by seven former shareholders of Knox Metals — Ed Parton, James Filler, Alan Dreher, George Dreher, Paul Dreher, Teja Jouhal, and Herbert Miller. We affirm.
The pertinent facts are as follows:
Chazen was the majority shareholder in two Tennessee corporations — Southern Foundry Supply, Inc. ("Southern Foundry"), and Southern Foundry of Cookeville, Inc. ("Southern Foundry-Cookeville"). Chazen also owned one-third of the stock in Knox Metals, also a Tennessee corporation, and served as its chief executive officer and as chairman of its board of directors; the plaintiffs collectively owned two-thirds of the stock in Knox Metals.[1] Chazen negotiated the sale of all three corporations as a group to Philip Metals (Ohio), Inc. ("Philip Metals"), an Ohio subsidiary of a Canadian corporation, Philip Services Corporation. Chazen represented the plaintiffs during the negotiations. Philip Metals paid (in cash and stock) $18,735,000 for Knox Metals. The sale was closed in Chattanooga, Tennessee, where Chazen, Philip Metals, Philip Services, and the plaintiffs executed a separate "Stock Purchase Agreement" with respect to the sale of Knox Metals. That Stock Purchase Agreement provides, in pertinent part, as follows:
 "This Stock Purchase Agreement (this `Agreement'), dated as of October 15, 1997, is by and among Gary D. Chazen (`Gary'), Ed Parton (`Ed'), James J. Filler (`James'), Alan J. Dreher (`Alan'), George R. Dreher (`George'), Paul A. Dreher (`Paul'), Teja Jouhal (`Teja'), and Herbert Miller (`Herbert'), residents of the State of Tennessee (Gary, Ed, James, Alan, George, Paul, Teja, and Herbert are each referred to herein as a `Shareholder,' and are referred to collectively herein as `Shareholders,' Philip Metals (Ohio), Inc., an Ohio corporation (the `Purchaser'), and Philip Services Corp., an Ontario corporation (`Philip').
". . . .
 "Whereas, the Shareholders collectively own all of the issued and outstanding shares of the Company; and *Page 1106 
 "Whereas, the Shareholders desire to sell to the Purchaser, and the Purchaser desires to purchase from the Shareholders, the Shares;
 "Whereas, Philip is the ultimate parent of the Purchaser and has agreed to guarantee the obligations of the Purchaser hereunder;
 "Now, Therefore, in consideration of the premises and the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:
". . . .
"Section 10.8. Arbitration.
 "a. In an event of any dispute, claim, question or difference arising out of or relating to this Agreement or the breach thereof (other than such disputes as may arise pursuant to Section 2.3, for which the resolution mechanism referred to therein shall apply), the parties hereto shall use their best endeavors to settle such disputes, claims, questions or difference. To this effect, they shall consult and negotiate with each other, in good faith and understanding of their mutual interests, to reach a just and equitable solution satisfactory to both parties. If they do not reach such solution within a period of thirty (30) days, then upon notice by either party to the other the disputes, claims, questions or differences shall be finally settled by arbitration in accordance with the provisions of the American Arbitration Association (the `AAA Rules').
 "b. The arbitration tribunal shall consist of one (1) arbitrator appointed by mutual agreement of the parties or, in the event of failure to [agree] within thirty (30) days, either party may apply to appoint an arbitrator in accordance with the AAA Rules. The arbitrator shall be qualified by education and training to pass upon a particular matter to be decided.
". . . .
 "d. The arbitration shall be conducted in English and take place in Pittsburgh, Pennsylvania.
 "e. The arbitration award shall be given in writing and shall be final, binding on the parties, not subject to any appeal, and shall deal with the question of costs of arbitration and all matters related thereto.
". . . .
 "Section 10.9. Shareholder Representative. The Shareholders hereby designate and appoint Ed Parton as the representative and agent of the Shareholders under this Agreement and in performing the obligations of the Shareholders under this Agreement; and for this [purpose] the Shareholders grant to him the authority to represent, act for and bind the Shareholders with regard to all matters hereunder, including but not limited to the negotiation, compromise or settlement of any claims or rights to indemnification asserted by the Purchaser. . . ."
The plaintiffs base their claims on allegations that Chazen engaged in wrongdoing in the negotiation of the sale of Knox Metals. The plaintiffs did not name Philip Metals or Philip Services as defendants and did not seek rescission of the Stock Purchase Agreement. The plaintiffs state in their brief that they have no dispute with anyone other than Chazen, from whom they seek $20,000,000 in damages.
Chazen moved to compel arbitration of the plaintiffs' claims, based on the arbitration provision in the Stock Purchase Agreement. The trial court denied the motion, holding that the dispute between the plaintiffs and Chazen did not arise out of or relate to the Stock Purchase Agreement.
The Federal Arbitration Act, 9 U.S.C. § 1 et seq., requires arbitration of a claim where a contract contains a written arbitration provision and where the contract *Page 1107 
evidences a transaction involving interstate commerce. See Koullas v. Ramsey, 683 So.2d 415, 416-17 (Ala. 1996), wherein this Court further noted:
 "The strong federal policy favoring the enforceability of arbitration contracts is designed to place arbitration agreements on the same footing as any other contract. Allied-Bruce Terminix Companies v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Like any other contract, an arbitration agreement must be enforced in accordance with its terms; both federal and state courts have consistently recognized that the duty to arbitrate is a contractual obligation and that a party cannot be required to arbitrate any dispute that he or she has not agreed to arbitrate. ATT Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); A. G. Edwards Sons v. Clark, 558 So.2d 358 (Ala. 1990)."
Whether an arbitration agreement applies to a dispute between the parties must be determined under general principles of state contract law. Crown Pontiac, Inc. v. McCarrell, 695 So.2d 615
(Ala. 1997) (citing First Options of Chicago, Inc. v. Kaplan,514 U.S. 938 (1995), and Doctor's Assocs., Inc. v. Casarotto,517 U.S. 681 (1996)).
The plaintiffs stipulate that the Stock Purchase Agreement involved interstate commerce. The dispositive issue is whether the arbitration provision contained in that contract applies to the plaintiffs' claims based on Chazen's alleged wrongdoing in negotiating the sale of Knox Metals. In resolving this issue, we must, as a threshold matter, determine whether the plaintiffs agreed to arbitrate any dispute with Chazen. If the arbitration provision covers disputes between the plaintiffs and Chazen, then we must determine whether the present dispute arises out of or relates to the Stock Purchase Agreement.
The Stock Purchase Agreement was executed in Tennessee, and it states that it "shall be governed by and construed in accordance with, the laws of the State of Tennessee." Alabama follows the principle of lex loci contractus, which, as a general rule, provides that a contract is governed by the laws of the state where it is made, except where the parties have legally contracted with reference to the laws of another state. Cherry, Bekaert Holland v. Brown, 582 So.2d 502 (Ala. 1991). Therefore, we must apply Tennessee contract law in determining whether the plaintiffs and Chazen agreed to arbitrate disputes among themselves.
The cardinal rule in Tennessee (as in Alabama) in regard to the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles. It is the duty of the court to enforce a contract according to its plain terms. The language of a contract must be taken and understood in its plain, ordinary, and popular sense. Courts are precluded from creating a new contract for the parties. Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc., 521 S.W.2d 578 (Tenn. 1975). In interpreting a contract, a court should consider the entire contract in determining the meaning of any or all of its parts. It is a universal rule that a contract must be examined from beginning to end and all of its terms reviewed, because one clause may modify, limit, or illuminate another. Cocke County Bd. of Highway Comm'rs v. Newport Util. Bd., 690 S.W.2d 231 (Tenn. 1985). A contract must be construed with reference to the situation of the parties, the business to which the contract relates, and the subject matter as it appears from the words used. Perry v. Sloan, 197 Tenn. 630,277 S.W.2d 355 (1955); New Life Corp. of America v. Thomas Nelson, Inc., 932 S.W.2d 921 (Tenn.Ct.App. 1996).
After examining the arguments made by Chazen (essentially that all of the plaintiffs are signatories to the Stock Purchase *Page 1108 
Agreement and that the arbitration provision therein is broad enough to encompass their claims), and after examining the arguments made by the plaintiffs (essentially that the Stock Purchase Agreement requires arbitration between Philip Metals, as the purchaser, and Philip Services, as the guarantor, on the one hand, and Chazen and the plaintiffs, as the sellers, on the other, and that the dispute between Chazen and the plaintiffs does not arise out of or relate to the Stock Purchase Agreement), we agree with the trial court that the plaintiffs' claims are not arbitrable. However, we do not base our holding on the reasons stated in the trial court's order. See Smith v. Equifax Servs., Inc., 537 So.2d 463 (Ala. 1988) (a judgment may be affirmed on any valid ground supported by the record).
The opening paragraph of the Stock Purchase Agreement designates Chazen and the plaintiffs as the "Shareholders." The word "Shareholders" is defined in the "Definitions" section of the contract as meaning "Gary D. Chazen, Ed Parton, James J. Filler, Alan J. Dreher, George R. Dreher, Paul A. Dreher, Teja Jouhal, and Herbert Miller." The opening paragraph of the contract designates Philip Metals as the "Purchaser." Philip Services, also a party to the contract, is referred to as the "ultimate parent [corporation] of the Purchaser" and the guarantor of "the obligations of the Purchaser hereunder." The term "Shareholders," used throughout the contract as referring collectively to the eight individual shareholders of Knox Metals, is used synonymously with the often-used terms "Seller" or "Sellers."[2] The terms "party" and "parties" are also used in various provisions in the contract. However, although those terms are not defined in the contract, it is evident from the context in which those terms are used that the primary rights and obligations created by the contract run between the "Shareholders," as a group, and the "Purchaser" (Philip Metals), and the guarantor (Philip Services). The contract does not evidence an intent to create rights and obligations as between the shareholders themselves.[3] *Page 1109 
Our conclusion in this regard is supported by § 10.9 of the contract," Shareholder Representative," which, as previously noted, provides in part:
 "The Shareholders hereby designate and appoint Ed Parton as the representative and agent of the Shareholders under this agreement and in performing the obligations of the Shareholders under this Agreement; and for this [purpose] the Shareholders grant to him the authority to represent, act for and bind the Shareholders with regard to all matters hereunder, including but not limited to the negotiation, compromise or settlement of any claims or rights to indemnification asserted by the Purchaser. . . ."
Further supporting our conclusion is the arbitration provision itself, which states that the parties "shall consult and negotiate with each other, in good faith and understanding of their mutual interests, to reach a just and equitable solution satisfactory to both parties." (Emphasis added.) That provision goes on to state that "either party" may refer a dispute to arbitration.
Based on the above, and given the fact 1) that a separate "Amended and Restated Stockholder Agreement" specifically governing certain rights and obligations of the officers and shareholders of Knox Metals did not contain an arbitration provision and 2) that the arbitration provision in the Stock Purchase Agreement called for arbitration to take place in Pittsburgh, Pennsylvania (a location that would appear to be much more convenient to Philip Metals and Philip Services than to the shareholder residents of Alabama and Tennessee), we conclude that under the Stock Purchase Agreement the "Shareholders" did not agree to arbitrate disputes among themselves. Reading the contract as Chazen suggests would, we think, result in a strained and unreasonable interpretation that would be inconsistent with Tennessee contract law.[4] *Page 1110 
Because we conclude that Chazen and the plaintiffs did not agree to arbitrate with each other, we find it unnecessary to determine whether this dispute arises out of or relates to the Stock Purchase Agreement. The trial court's order is affirmed.
AFFIRMED.
Hooper, C. J., and Maddox, Cook, See, Lyons, Brown, and Johnstone, JJ., concur.
[1] Chazen is a Tennessee resident. All of the plaintiffs, except Parton, are residents of Alabama; Parton is a Tennessee resident.
[2] For example, the contract states that "the Shareholders desire to sell to the Purchaser, and the Purchaser desires to purchase from the Shareholders, the Shares." The contract also states that "the Shareholders shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase from the Shareholders," certain shares of stock in the corporation.
[3] For example, the following paragraph appears in paragraph d. of § 2.4, "Adjustment of Purchase Price":
 "The Purchaser shall have the opportunity to examine the work papers, schedules and other documents prepared by the Shareholders in connection with its preparation of the Closing Date Statements. The Closing Date Statements shall be final and binding on the parties unless, within 15 Business Days after delivery to the Purchaser, notice is given by the Purchaser of its objection setting forth in reasonable detail the basis for such objection. If the parties are unable to reach agreement within fifteen days after the notice of objection has been given, the dispute shall be referred for resolution to the offices of Coopers 
Lybrand, L.L.P. (the `Accountants') as promptly as practicable. The Accountants will make a determination as to each of the items in dispute, which determination will be (i) in writing, (ii) furnished to each of the parties hereto as promptly as practicable after the items in dispute have been referred to the Accountants, (iii) made in accordance with this Agreement, taking into account all of the special accounting provisions of Section 2.4(a) and (b) even if not consistent with GAAP, and (iv) conclusive and binding upon each of the parties hereto. The fees and expenses of the Accountants will be shared equally by the Purchaser and the Shareholders, unless the Accountants determine that no items in dispute require material adjustment or the Accountants fail to take into account all of the special accounting provisions of Section 2.4(a) and (b), in which case the fees and expenses of the Accountants shall be borne entirely by the Purchaser. If the Accountants fail to take into account all of the special accounting provisions of Section 2.4 (a) and (b), then the Purchaser shall pay the legal, accounting and other expenses of the Shareholders reasonably necessary to respond to such failure of the Accountants. Each of the parties hereto will use reasonable efforts to cause the Accountants to render their decision as soon as reasonably practicable, including, without limitation, by promptly complying with all reasonable requests by the Accountants for information, books, records and similar items."
(Emphasis added.)
Another example can be found in § 6.11, "Knowledge of Parties":
 "In the event that the Purchaser on the one hand, or the Shareholders on the other hand (the `Knowing Party') has actual knowledge at the time of the Closing that a representation or warranty made by the other party is false or the other party has violated a covenant made by it under this Agreement, the Knowing Party shall promptly notify the other party of such fact. If the Knowing Party proceeds to the Closing notwithstanding such knowledge, the Knowing Party shall be deemed to have waived any rights it may have for indemnification or damages against the other party to the extent that any damages result from such breach of representation or warranty or failure to perform such covenant."
(Emphasis added.)
A third example appears in § 7.2e, "Schedules":
 "The parties acknowledge that certain of the Schedules and Exhibits referred to in this Agreement have not been completed, and are to be delivered by the parties as soon as reasonably possible, and in no event later than the Closing Date. The Schedules and Exhibits, when delivered, will be subject to the mutual approval and acceptance of the Shareholders and the Purchaser as a condition precedent to the obligations of the parties under this Agreement."
(Emphasis added.)
A final example can be found in § 8.5, "Indemnification Proceedings." Sections 8.3 and 8.4 set out the respective indemnification obligations of the "Shareholders" and the "Purchaser." Section 8.5a then states, in part:
 "Any party seeking indemnification under this Article (the 'Indemnified party') shall forthwith notify the party against whom a claim for indemnification is sought hereunder (the `indemnifying party') in writing, which notice shall specify, in reasonable detail, the nature and estimated amount of the claim."
(Emphasis added.) The section goes on to spell out the rights and responsibilities of the "indemnified party" and the "indemnifying party."
[4] We note that Tennessee has adopted the Uniform Arbitration Act, T.C.A. § 29-5-301 et seq. In interpreting that Act, Tennessee courts have recognized that arbitration is a matter of contract and that a party cannot be required to submit a dispute to arbitration unless it has agreed to do so. Tennessee courts do apply a presumption of arbitration; however, they will interpret an arbitration provision only as broadly as the intentions of the parties, drawn from their expressions, will warrant. See Arnold v. Morgan Keegan Co., 914 S.W.2d 445 (Tenn. 1996); Buraczynski v. Eyring, 919 S.W.2d 314 (Tenn. 1996); Wachtel v. Shoneys, Inc.,830 S.W.2d 905 (Tenn.Ct.App. 1992).
See, J., files statement of nonrecusal.
SEE, Justice (statement of nonrecusal).
The plaintiffs, Ed Parton and others, through their attorney, have moved for my recusal in this case based on the fact that Larry Childs, my brother-in-law, is a partner in the law firm of Walston, Wells, Anderson Bains, and the fact that Gary Chazen, the defendant, is represented by Vernon Wells, who is also an attorney in the law firm of Walston, Wells, Anderson Bains. After making an in camera examination of affidavits provided by Walston, Wells, Anderson Bains, I have determined that Mr. Childs has no interest in the law firm that will be substantially affected by the outcome of this case. Accordingly, for the reasons given in my statement of nonrecusal in Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc., [Ms. 1960220, June 25, 1999] ___ So.2d ___, ___ (Ala. 1999) (See, J., statement of nonrecusal), I decline to recuse.