SEE, Justice.
Glenda F. Colquitt is the plaintiff in an action pending in the Mobile Circuit Court. She petitions this Court for a writ of mandamus directing the trial court to vacate its order staying the proceedings and granting the motion of the defendant First USA Bank, N.A. (the “Bank”), to compel arbitration. We deny Colquitt’s petition for the writ of mandamus.
I.
First USA Bank, N.A., is a Delaware-based national bank that issues credit cards. In August 1996, after receiving in *1020 the mail an application from the Bank, Colquitt applied for a “Visa Gold” credit card; Colquitt says the application indicated the card would have an annual percentage rate (“APR”) of 5.9% for an “introductory period” and that the rate would increase to a “fixed” rate of 12.99% after the introductory period. The Bank issued the credit card to Colquitt in September 1996. Along with the credit card, the Bank sent Colquitt a “Cardmember Agreement” (the “Agreement”) that established the terms of her account. According to the Agreement, a cardholder accepted the terms of the Agreement by using her credit card. Colquitt used her credit card, thereby, the Bank says, accepting the terms of the Agreement.
The Agreement contains a provision detailing how it can be amended:
“Amendments: We [the Bank] can amend the terms of this Agreement at any time. We will notify you by mail of what these amendments are. Subject to the requirements of applicable law, any amendment to this Agreement will become effective at the time stated in our notice to you and, unless we specify otherwise, the amended terms of this Agreement will apply to all outstanding unpaid indebtedness in your Account as well as new transactions.”
The Agreement also contains a “choice-of-law” provision:
“GOVERNING LAW: THIS AGREEMENT AND YOUR ACCOUNT WILL BE GOVERNED BY THE LAW OF THE STATE OF DELAWARE AND, AS APPLICABLE, FEDERAL LAW.”
(Capitalization original.)
Beginning on February 1, 1997, following the introductory period, the APR on Colquitt’s account was increased to 12.99%. In July 1997, the Bank raised the APR on Colquitt’s account from 12.99% to 16.99%, and the APR remained at this rate for 16 months. According to Colquitt, during these 16 months, she repeatedly requested that the Bank lower her APR to the advertised 12.99% rate and provide an explanation for the increased APR. The Bank refused both requests, promising only to “look into the matter.”
In November 1997, the Bank mailed to Colquitt, enclosed with her monthly billing statement, a notification of several changes in the terms of the Agreement, including the addition of an arbitration provision, which reads in pertinent part:
“ARBITRATION: Any claim, dispute or controversy (‘Claim’) by either you or us against the other, arising from or relating in any way to this Agreement or your Account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration.... This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. Judgement upon any arbitration award may be entered in any court having jurisdiction.
“This arbitration agreement applies to all claims now in existence or that may arise in the future....
“IN THE ABSENCE OF THIS ARBITRATION AGREEMENT, YOU AND WE MAY OTHERWISE HAVE HAD THE RIGHT OR OPPORTUNITY TO LITIGATE CLAIMS THROUGH A COURT, AND/OR TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS, BUT EXCEPT AS OTHERWISE PROVIDED ABOVE, ALL CLAIMS MUST NOW BE RESOLVED THROUGH ARBITRATION.”
(Capitalization original.) Cardholders were given the option of rejecting the new *1021 terms. The following “opt-out” provision appears on the first page of the notification:
“EFFECTIVE DATE/NON-ACCEPTANCE INSTRUCTIONS.
The changes in terms summarized above will become effective January 1, 1998.... The new terms will apply to current and future balances in both active accounts and accounts that no longer have charge privileges. If you do not wish to accept' the new terms, you must notify us in writing of your decision by December 30, 1997.... Giving us this notice will constitute your election to cancel your charge privileges (if not previously cancelled), but you may pay off any outstanding balance of your account under your prior terms.”
(Capitalization original.)
Colquitt did not reject the new terms and continued to make charges on her account after January 1,1998.[1]
In November 1998, the Bank lowered the APR on Colquitt’s account back to 12.99%. Subsequently, Colquitt requested that the Bank refund all “excess” finance charges incurred as a result of the 16.99% APR that had been charged on her account for 16 months. The Bank denied her request.
In the summer of 1999, the Bank again raised the APR on Colquitt’s account, this time to 24.99%. After Colquitt’s counsel investigated the matter and contacted the Bank, the Bank responded in a letter, stating that it had erred in raising the APR on Colquitt’s account to 16.99% for 16 months and that it would remove all excess finance charges incurred as a result.[2] However, the Bank further stated that the subsequent increase in the APR on Colquitt’s account was “in accordance with the terms and conditions outlined in the Cardholder Agreement provided when the account was opened”; the Agreement provided that the APR would be increased if the cardholder made two late payments within a period of six months. According to the letter, “the account minimum payments which were due on January 3, 1999, February 5, 1999, March 6, 1999, April 3, 1999, and August 16, 1999, were received after the dates due.” The Bank stated, however, that “[effective with Colquitt’s October 1999 billing statement,” her account APR would be returned to 12.99%, but it reserved the right to increase her rate if, in the future, she was late with her payments twice within a six-month period.
On December 3, 1999, Colquitt sued the Bank and fictitiously named defendants, alleging fraud, breach of contract, unjust enrichment, and deceptive trade practices. The Bank moved to compel arbitration, and the trial court granted its motion. Colquitt petitions for a writ of mandamus directing the trial court to vacate its order compelling arbitration and staying the proceedings.
II.
The writ of mandamus is an extraordinary remedy, and one petitioning for it must show (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty on the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of *1022 the court. Ex parte Edgar, 543 So.2d 682, 684 (Ala.1989). Although mandamus relief is an extraordinary remedy, it is available when a party demonstrates that she has been compelled to arbitrate a claim that she did not agree to arbitrate. Ex parte Beasley, 712 So.2d 338, 339-40 (Ala.1998). We review a trial court’s order compelling arbitration by determining whether the trial court abused its discretion. See Ex parte McKinney, 515 So.2d 693, 696 (Ala.1987).
Section 2 of the Federal Arbitration Act (“FAA”) provides:
“A written provision in any ... contract evidencing a transaction involving [interstate] commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable....”
9 U.S.C. § 2. The FAA preempts any contrary state law. See Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 271, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The FAA requires a trial court to stay or dismiss proceedings and to compel arbitration if the parties have entered into a valid contract containing an arbitration agreement. Moreover, the Supreme Court of the United States has stated that the FAA establishes a strong federal policy favoring arbitration:
“The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.”
Moses H. Cone Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). These principles provide the framework within which we must determine whether the trial court erred in requiring Colquitt to arbitrate the claims relating to her account with the Bank.
III.
We initially note that Colquitt does not contest that her transactions with the Bank involved interstate commerce. See Alliedr-Bruce Terminix, supra (1995) (recognizing that the FAA applies only to transactions involving interstate commerce). Instead, Colquitt contends that the “arbitration provision is voidable because it was procured by fraud and/or because its cost-related terms are unconscionable.” Specifically, Colquitt argues that the Bank “committed multiple frauds upon [her] leading up to, during, and after the .very time (November 1997) it was purportedly ‘amending’ the Cardmember Agreement by inserting an arbitration provision.” She asserts that the Bank misrepresented that, after the introductory period, the APR would be fixed at 12.99%. She further asserts that the Bank “fraudulently raised the APR to 16.99% for 16 straight months” and that, after she made repeated inquiries, it “fraudulently misrepresented ... that [it] would ‘look into the matter’ and straighten out any problems.” [3]
*1023 In addition, Colquitt asserts that the arbitration provision is unconscionable, and, thus, voidable, because, she says, under the “National Arbitration Forum Rules” made applicable by the arbitration provision,[4] she would have to pay a filing fee of $1,125 based on her demand for $100,000 in damages. According to Col-quitt, this filing fee is more than $900 greater than the costs she incurred in filing her action in the trial court.
The United States Supreme Court has stated:
“[T]he text of § 2 [of the FAA] declares that state law may be applied ‘i/that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.’ [Perry v. Thomas, 482 U.S. 483, 492, n. 9 [, 107 S.Ct. 2520, 96 L.Ed.2d 426] (1987).] Thus, generally applicable contract defenses, such as fraud, duress or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2.”
Doctor’s Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)(second emphasis added). The parties do not dispute that, pursuant to the “choice-of-law” provision in the Agreement, this Court must apply Delaware law and federal law in construing the Agreement.
“[T]he public policy of [Delaware] favors the resolution of disputes through arbitration.” Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908, 911 (Del.1989). “Delaware follow[s] the standard hornbook principles of contract construction that emphasize the importance of text.” Rohe v. Reliance Training Network, Inc., [Ms. 17992, July 21, 2000] (Del. Ch.2000) (not published in Atlantic 2d)(citing Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del.1992)). “It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. Only when there are ambiguities may a court look to collateral circumstances.” Citadel, 603 A.2d at 822 (citations omitted). The starting point, therefore, must be the language of the Agreement.
In James Julian, Inc. v. Raytheon Service Co., 424 A.2d 665, 667 (Del.Ch.1980), the Delaware Court of Chancery held that a contractual dispute between a general contractor and a subcontractor was subject to arbitration. The disputed contract included a broad arbitration provision that stated, in part: “ ‘[A]ny controversy or claim ... arising out of or relating to this Contract ... shall be settled by arbitration.’ ” Id. at 667. The Court of Chancery held that questions concerning the scope of an arbitration agreement are ordinarily to be determined by the arbitrator and not by a court and that “[a]ll doubts as to the arbitrability of an issue must be resolved in favor of arbitration.” Id. at 667.
The arbitration provision at issue in this present case is similar to that in James Julian; it provides, in part, that “[a]ny claim, dispute or controversy ... arising from or relating in any way to this Agreement or your Account, including Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved by binding arbitration.” (Emphasis added.) The arbitration provision further states that “[t]his arbitration agreement applies to all claims now in existence or that may *1024 arise in the future.” Because of the broad language of the arbitration provision, we conclude that its enforceability is an issue to be determined by an arbitrator and not by a court. James Julian, 424 A.2d at 667.
Finally, Colquitt argues that the arbitration provision is inapplicable to this dispute. Specifically, she contends that, pursuant to the “opt-out” provision, the amendments to the Agreement, including the arbitration provision, - “apply only to ‘current and future balances,’ ” and not to the balances she maintained before January 1, 1998. The “opt-out” provision states that “[t]he new terms will apply to current and future balances in both active accounts and accounts that no longer have charge privileges”; she argues that her dispute is not over a “current [or] future” balance, but a “past” balance.+
When a court interprets the language of an arbitration provision, “any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.” Moses H. Cone Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, a motion to compel arbitration should not be denied “unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.” United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Colquitt would distinguish between a “current” or “future” balance and what she would call a “past balance.” The second part of the sentence on which she relies — a statement that the new terms apply to “both active accounts and accounts that no longer have charge privileges ” (emphasis added) — demonstrates, however, that past balances must be balances that had existed in accounts that are paid off, since an account that no longer has charge privileges, a fortiori, can only be one with a balance that was acquired, like hers, in the past. Because the amendments are “susceptible of an interpretation that covers the asserted dispute,” United Steelworkers, 363 U.S. at 582-83, 80 S.Ct. 1347, we conclude that the arbitration provision applies to this dispute.
IV.
We conclude that the trial court did not abuse its discretion in compelling arbitration. Because Colquitt has not shown a clear legal right to have the trial court vacate its order compelling arbitration and staying the proceedings, Ex parte Edgar, 543 So.2d at 684, we deny her petition for the writ of mandamus.
PETITION DENIED.
HOUSTON, BROWN, HARWOOD, and STUART, JJ., concur.
WOODALL, J., concurs in the result.

. In an affidavit submitted to the trial court, Colquitt admitted she never saw the arbitration provision included with her November 1997 billing statement.

. This adjustment was supposed to be reflected on Colquitt’s October 1999 billing statement. However, no evidence before this Court indicates whether the Bank actually did remove the "excess” finance charges incurred during the 16 month period.

. Colquitt's fraud claims are not directed to the arbitration provision itself. Rather, she is essentially asserting that the Bank fraudulently induced her to enter into the Agreement which, as amended, contained the arbitration provision. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 406, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the United States Supreme Court held that a claim of fraud in the inducement of a contract containing an arbitration provision must be resolved by arbitrators, where the contract includes a provision calling for arbitration of any controversy or claim arising out of or relating to the agreement or breach thereof.

. The arbitration provision states, in pertinent part, that disputes subject to the arbitration provision "[s]hall be resolved by binding arbi-(ration by the Rules and forms of the National Arbitration Forum, under the Code of Procedure in effect at the time the Claim is filed.”