# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CW05-917
### consolidated with 05-1129


**CLARK A. GUNDERSON, M.D., ET AL.**

**VERSUS**

**F. A. RICHARD & ASSOCIATES, INC., ET AL.**


************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. 2004-2417,
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Jimmie C. Peters, Michael G. Sullivan, and Glenn B. Gremillion, Judges.


**WRIT DENIED; JUDGMENT AFFIRMED.**

Thomas A. Filo
Cox, Cox, Filo, Camel & Wilson, L.L.P.
723 Broad Street
Lake Charles, Louisiana 70601
(337) 436-6611
Counsel for Plaintiffs/Applicants/Appellees:
    Beutler-England Clinic
    Dr. Clark Gunderson
    Dr. Frank W. Lopez

**Stephen B. Murray**
**Arthur M. Murray**
**Nicole A. Ieyoub**
**The Murray Law Firm**
**909 Poydras Street, Suite 2550**
**New Orleans, Louisiana  70112**
**(504) 525-8100**
**Counsel for Plaintiffs/Applicants/Appellees:**
     **Beutler-England Clinic**
     **Dr. Frank W. Lopez**
     **Dr. Clark Gunderson**

**John S. Bradford**
**William B. Monk**
**Stockwell, Sievert, Viccellio,**
**Clements & Shaddock, L.L.P.**
**One Lakeside Plaza, Fourth Floor**
**Lake Charles, Louisiana  70601**
**(337) 436-9491**
**Counsel for Plaintiffs/Applicants/Appellees:**
     **Dr. Clark Gunderson**
     **Beutler-England Clinic**
     **Dr. Frank W. Lopez**

**Charles S. McCowan, Jr.**
**Todd A. Rossi**
**Terrence D. McCay**
**Charles S. McCowan, III**
**Louis V. Gregoire, Jr.**
**Kean, Miller, Hawthorne, D'Armond,**
**McCowan & Jarman, LLP**
**Post Office Box 3513**
**Baton Rouge, Louisiana  70821**
**(225) 387-0999**
**Counsel for Defendant/Respondent/Appellant:**
     **Focus Healthcare Management, Inc.**

**Michael Kendall**
**Lauren M. Papenhausen**
**Jennifer S. Geetter**
**McDermott Will & Emery, LLP**
**28 State Street**
**Boston, Massachusetts  02109-1775**
**(617) 535-4000**
**Counsel for Defendant/Respondent/Appellant:**
     **Focus Healthcare Management, Inc.**

**Gustave A. Fritchie, III**
**David W. O'Quinn**
**Douglas J. Moore**
**Irwin, Fritchie, et al**
**400 Poydras Street, Suite 2700**
**New Orleans, Louisiana  70130**
**(504) 310-2100**
**Counsel for Defendant:**
     **Cambridge Integrated Services, Inc.**

**John E. Galloway**
**Galloway, Johnson, Tompkins, Burr & Smith**
**701 Poydras Street, Suite 4040**
**New Orleans, Louisiana 70139**
**(504) 525-6802**
**Counsel for Defendant:**
**F. A. Richard & Associates, Inc.**

**Perry R. Staub, Jr.**
**Larry E. Demmons**
**Taggart, Morton, Ogden, Straub,**
**Rougelot & O'Brien**
**1100 Poydras Street, Suite 2100**
**New Orleans, Louisiana 70163-2100**
**(504) 599-8500**
**Counsel for Defendant:**
**First Health Group Corporation**

**Janice B. Unland**
**Robert T. Lorio**
**Paul Eric Harrison**
**Rabalais, Unland & Lorio**
**5100 Village Walk, Suite 300**
**Covington, Louisiana 70433**
**(985) 893-9900**
**Counsel for Defendant:**
**National Loss Control Management, Inc.**

**Steve M. Sikich**
**The Sikich Law Firm**
**Post Office Box 1432**
**Lake Charles, Louisiana 70602**
**(337) 721-8008**
**Counsel for Defendant:**
**First Health Group Corporation**

**E. Paige Sensenbrenner**
**John B. Davis**
**Rusty John Savoie**
**Andrew C. Kolb**
**Adams & Reese**
**701 Poydras Street, Suite 4500**
**New Orleans, Louisiana 70139**
**(504) 585-0283**
**Counsel for Defendant:**
**AIG Claims Service, Inc.**

**Kimberly G. Anderson**
**Attorney at Law**
**701 Poydras Street, 40th Floor**
**New Orleans, Louisiana 70139**
**(504) 525-2456**
**Counsel for Defendant:**
**F. A. Richard & Associates, Inc.**

**Theodore Robert Scarborough**
**Attorney at Law**
**10 S. Dearborn Street, 48th Floor**
**Chicago, Illinois  60603**
**(312) 853-7000**
**Counsel for Defendant:**
**AIG Claims Service, Inc.**

SULLIVAN, Judge.

The issues presented by this consolidated writ application and appeal concern whether the trial court was correct in ordering some, but not all, of Plaintiffs' claims to proceed to arbitration. Finding no error in the trial court's rulings, we deny the writ and affirm the judgment, as more fully explained below.

**Procedural History**

Plaintiffs, four medical providers, filed this class action suit against six named Defendants who are identified as preferred provider organizations, third-party administrators, or other intermediaries "who have contracted with various health care providers in the State of Louisiana to pay less than the amount mandated by LA R.S. 23:1203(B) in workers' compensation cases without providing prior notice to the healthcare providers as required by LA R.S. 40:2203.1."[1] As a result of Defendants' alleged violations of La.R.S. 40:2203.1(B), Plaintiffs sought damages and attorney fees under La.R.S. 40:2203.1(G), as well as injunctive relief. One of the named Defendants, Focus Healthcare Management, Inc. ("Focus"), filed a motion to stay pending arbitration based upon arbitration clauses in several preferred provider organization (PPO) contracts, but before that motion was heard, Defendants removed the case to federal district court. Upon remand of the case to state court, several other Defendants filed motions to stay as well; however, only Focus' motion is presently before this court.

---

[1]The four named Plaintiffs, Clark A. Gunderson, M.D. (A Medical Corporation), Beutler-England Chiropractic Clinic, Frank W. Lopez, M. D. (A Professional Medical Corporation), and Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital, sought class certification on behalf of all medical providers whose charges for services provided to workers' compensation patients have allegedly been discounted pursuant to a preferred provider agreement "*without a benefit card being issued or 30 day written notice being supplied pursuant to LA R.S. 40:2203.1(B).*" (Emphasis added.) Plaintiffs also sought certification of a "Group Purchaser Defendant Class" that would include the six named Defendants, F. A. Richard & Associates, Inc., First Health Group Corp., Focus Healthcare Management, Inc., Cambridge Integrated Services Group, Inc., National Loss Control Management, Inc., and AIG Claim Services, Inc.

After a lengthy hearing, the trial court granted Focus' motion as to the claims of Beutler-England Chiropractic Clinic ("Beutler-England") and Frank W. Lopez, M.D. (A Medical Corporation) ("Dr. Lopez"). The trial court also granted Focus' motion as to some of the claims of Clark A. Gunderson, M.D. (A Medical Corporation) ("Dr. Gunderson"), but denied the motion as to other claims of Dr. Gunderson.[2] The writ application filed by Dr. Gunderson, Beutler-England, and Dr. Lopez seeking to overturn the ruling in favor of Focus was consolidated in this court with Focus' appeal of the partial ruling in favor of Dr. Gunderson.

## Opinion

As the supreme court explained in *Collins v. Prudential Insurance Co. of America*, 99-1423, pp. 9-10 (La. 1/19/00), 752 So.2d 825, 831: "Before a district court may compel arbitration, the trial judge must make two preliminary determinations. First, the trial judge must ensure that a valid arbitration agreement between the parties exists. Second, the judge must decide whether the dispute at issue falls within the scope of the agreement."

State law principles govern the first question, while federal substantive law governs the second, if the case is subject to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). *Collins*, 752 So.2d 825. "[T]he substantive provisions of the [FAA] preempt state law and govern all written arbitration agreements in contracts connected to transactions involving interstate commerce." *Id.* at 827. "Furthermore, the Supreme Court has concluded that Congress intended to exercise its commerce powers to the fullest in legislating in favor of arbitration." *Aguillard v. Auction*

---

[2]The parties agreed that Focus' motion to stay and compel arbitration pertaining to the claims of another Plaintiff, Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital, would be taken up at a later date.

*Mgmt. Corp.*, 04-2804, p. 8 (La. 6/29/05), 908 So.2d 1, 8 (citing *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834 (1995)).

In the present case, the parties agree that Focus is a Tennessee corporation, and in some of the contracts at issue, Focus represents that it "contracts with providers and facilities *in the various states* to offer FOCUS' Clients with access to providers." (Emphasis added.) Thus, at first glance, it would appear that the FAA governs this dispute. However, without going into further analysis, we note that the FAA is considered to be virtually identical to the Louisiana Arbitration Law, 9:4201-4217 ("LAL"); therefore, Louisiana courts have recognized that "determinations regarding the viability and scope" of an arbitration clause would be the same under either law, and federal jurisprudence interpreting the FAA may be considered in construing the LAL. *Shroyer v. Foster*, 01-385, p. 6 (La.App. 1 Cir. 3/28/02), 814 So.2d 83, 87. As the supreme court recognized in *Aguillard*, 908 So.2d at 8, both Louisiana and federal law favor arbitration such that "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration."

*Dr. Gunderson—Writ Application*

On June 5, 2003, Dr. Gunderson signed a "Preferred Provider Physician Agreement" with American Lifecare Networks ("American Lifecare"), which is not a Defendant herein. Under that agreement, American Lifecare identified itself as an entity that "enters into agreements with hospitals, physicians, and other provider members" to provide covered services to individuals with whom it directly or indirectly contracts. One of American Lifecare's duties under that agreement was to "negotiate with Plan(s) for payment to [Dr. Gunderson]" for the medical services he provided to covered individuals. In furtherance of this goal, Dr. Gunderson

3

authorized American Lifecare "to negotiate agreements for payment . . . by Plan for delivery of Covered Services to Covered Individuals pursuant to this Agreement." One of the agreements that American Lifecare negotiated on behalf of Dr. Gunderson was with Focus, an organization that discounts, but does not pay, workers' compensation medical bills for its network members. Both the Gunderson-American Lifecare agreement and the American Lifecare-Focus agreement contain similar clauses requiring the parties to arbitrate "any dispute or claim arising under this Agreement."[3]

Dr. Gunderson argues that the trial court erred in finding that a valid arbitration agreement exists between him and Focus, given that he did not sign any contract with Focus, nor did he expressly authorize American Lifecare to bind him to an arbitration agreement as required by La.Civ.Code art. 2997.[4]

Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Lakeland Anesthesia, Inc. v. CIGNA Healthcare Group of La., Inc.,* 01-1059, p. 4 (La.App. 4 Cir. 2/6/02), 812 So.2d 695, 698 (quoting *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418 (1986)). Nonetheless, "a non-signatory to an agreement containing an arbitration provision may be bound by that provision under accepted theories of agency or contract law . . . ." *Lakeland Anesthesia, Inc. v. United Healthcare of La., Inc*., 03-1662, p. 18 (La.App. 4 Cir.

---

[3]Dr. Lopez also signed an agreement with American Lifecare that is substantially similar to the one signed by Dr. Gunderson. Accordingly, this discussion also applies to the claims of Dr. Lopez based upon his contract with American Lifecare.

[4]Louisiana Civil Code Article 2997 provides in part: "Authority also must be given expressly to: . . . (5) Enter into a compromise or refer a matter to arbitration."

3/17/04), 871 So.2d 380, 393, *writs denied*, 04-969, 04-972 (La. 6/25/04), 876 So.2d 834.

Focus argues that Dr. Gunderson authorized American Lifecare to negotiate agreements such as the one between American Lifecare and Focus on his behalf. Therefore, according to Focus, Dr. Gunderson is bound by all provisions of the American Lifecare-Focus agreement, including its arbitration clause. Focus further argues that Dr. Gunderson cannot object to the arbitration clause in the Focus contract because that clause is virtually identical to the one in the contract that he signed with American Lifecare, with the only distinction between the two being the designation of the place of arbitration.

In *Landis Construction Co., Inc. v. Health Education Authority,* 367 So.2d 330 (La.1979), the board of directors of a public agency passed a resolution authorizing its chairman to execute a construction contract with the plaintiff, who had submitted the lowest bid for the building of a parking garage; the resolution further provided that the contract was to be approved in advance by the agency's architect and general counsel. After a lien dispute arose, the construction company sued the agency, seeking to compel arbitration as provided in the construction contract, and the agency responded by arguing that the signatories to the contract were without authority to stipulate for arbitration. The supreme court enforced the arbitration provision, finding that the agency's authorization for its chairman to execute the specific construction contract "included the authority to bind [the agency] to each and every provision of the contract, including the stipulation for arbitration." *Id*. at 332. The court also noted that the arbitration clause in the contract had been seen by the agency's general counsel and architect.

5

In *People's Federal Savings & Loan Ass'n v. Mortgage Government Securities, Inc.*, 87-3859, 1988 WL 59729 (E.D. La. 5/4/88), the federal district court relied on *Landis*, 367 So.2d 330, to enforce an arbitration provision in a securities account "customer agreement." The agreement was executed by a savings and loan association's chief executive officer who had been authorized by the association's executive committee to sell certain securities as needed. After finding that the officer was given express authority to sell the securities, the court concluded that that authority encompassed executing the customer agreement as necessary or incidental to the sale, as well as binding the association "to each provision of the contract, including the provision for arbitration of claims." *Id.* at p. 4.

The purpose of the Gunderson-American Lifecare agreement was for American Lifecare to negotiate on behalf of Dr. Gunderson with other entities that would increase his patient base in exchange for a payment at a negotiated rate. Thus, notwithstanding contractual language that the parties' only relationship shall be "independent entities contracting with each other," the contract clearly contemplates that American Lifecare will act as Dr. Gunderson's representative at least for the limited purpose of accessing patients through agreements with other entities. Dr. Gunderson's access to those patients from the Focus network, or from any other network, was dependent upon an agreement between American Lifecare and that other entity. Additionally, Dr. Gunderson's recovery from Focus for noncompliance with La.R.S. 40:2203.1(B) concerns the conditions under which the "alternative rates of payment" contained in a "preferred provider organization agreement" are enforceable. Accordingly, we find under *Landis* and *People's*, that Dr. Gunderson's authorization for American Lifecare to contract for access to patients in various

6

networks included the authority to bind him to all provisions of those contracts, particularly where the American Lifecare agreement contained almost the same arbitration clause as the Focus agreement. We further note that to allow Dr. Gunderson to benefit from those agreements or to rely on them in pursuit of a statutory claim without enforcing their arbitration clauses would amount to allowing the prohibited situation described in *Aguillard*, 908 So.2d 1, namely, that a state may not "decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause." *Id*. at 8 (quoting *Allied-Bruce Terminix Cos., Inc.*, 513 U.S. at 281, 115 S.Ct. at 843).

Dr. Gunderson also argues that this dispute does not fall within the scope of the arbitration agreements at issue because the contract he signed did not give American Lifecare authority to negotiate with Focus, an organization that is not a "payor" and because the object of this suit, a claim for statutory damages and attorney fees, is not one "arising under" any of the contracts at issue, as required by both arbitration agreements.

Concerning the scope of an arbitration agreement, the supreme court stated in *Aguillard*, 908 So.2d at 18:

> [E]ven when the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration. The weight of this presumption is heavy and arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue. Therefore, even if some legitimate doubt could be hypothesized, this Court, in conjunction with the [United States] Supreme Court, requires resolution of the doubt in favor of arbitration.

As noted above, the statute under which Dr. Gunderson seeks relief depends upon the existence of a "preferred provider organization agreement" and concerns

7

whether the "alternative rates of payment" in such agreements are enforceable. Additionally, the named Plaintiffs seek class certification of all medical providers whose workers' compensation charges have been discounted "pursuant to a preferred provider agreement." Thus, the PPO agreements are central to defining the purported class of plaintiffs and to the statutory claims asserted. Given both the federal and state policies favoring arbitration, we decline to exercise our supervisory jurisdiction to overturn the trial court's order of arbitration.

*Dr. Gunderson—Appeal*

In March of 1998, Dr. Gunderson, as member of the Lake Charles Physician Hospital Organization ("LCPHO"), agreed to accept the terms of a contract that LCPHO negotiated on behalf of its members with Guardian Resources, Inc., later known as Evolutions Healthcare Systems, Inc. ("Evolutions"). Under that contract, Evolutions was identified as a "non-risk bearing Network that intends to contract with Payors with respect to the rendering of Hospital's services for the benefit of such Payor groups who contract with [Evolutions]," and LCPHO indicated that it "wishes to enter into an agreement with [Evolutions] to participate in the Network established by [Evolutions]." On the form that Dr. Gunderson completed to indicate his acceptance of the LCPHO-Evolutions agreement, he checked that he wished to accept both commercial insurance and workers' compensation payors through the Evolutions-LCPHO contract. However, an appendix to the contract provided that the workers' compensation reimbursement rate "shall be paid at one hundred percent (100%) of the Louisiana Workers' Compensation fee schedule."

On May 1, 2002, Evolutions executed a "Provider Organization Agreement" to become part of Focus' network. Although the LCPHO-Evolutions agreement did

8

not contain an arbitration clause, the Evolutions-Focus agreement did. The trial court found there was no mandate from Dr. Gunderson to contract for arbitration given the absence of an arbitration clause in the LCPHO-Evolutions agreement. We also note the presence of an additional intermediary in this set of contracts, as LCPHO, and not Dr. Gunderson, was the party that negotiated the initial Evolutions agreement. Under these circumstances, we find no error in the trial court's refusal to order arbitration of Dr. Gunderson's claims against Focus based upon the Evolutions agreement.

*Beutler-England*

Dr. Carol Beutler and Dr. Don England, the current members of the Beutler-England partnership, were previously partners in another entity, the England-Masse Chiropractic Clinic (England-Masse). An order appointing a liquidator for England-Masse was signed on January 9, 2003, and partnership articles for the Beutler-England partnership were executed on October 23, 2003.

While they were members of the England-Masse partnership, Drs. Beutler and England each executed "Medical Provider Participation Agreement[s]" with Focus effective June 27, 2000. Both provider agreements listed "England-Masse" as the "Provider/Group Name" and included England-Masse's federal tax identification number. Each doctor signed as "Partner," and above each signature appeared the notation: "By signing hereunder on behalf of a corporation, partnership, facility, group practice or other legal entity, I certify that I have full authority to bind each individual member of such entity identified above [England-Masse]." Each doctor also signed a separate appendix that provided for workers' compensation health services to be reimbursed at "the lessor [sic] of 80% of the: Usual and Customary

9

Rate; Medical Provider's billed charge; or Maximum fee schedule amount established by applicable law."

On February 27, 2003, after the liquidator had been appointed to dissolve England-Masse, Beutler-England faxed a "Provider Update" form to Focus with a cover sheet referencing "Changes made to our Company." On the form, the name "England-Masse Chiropractic" is crossed-out and is replaced with "Beutler-England Chiropractic," and new tax identification and telephone numbers are provided. The form also indicates that two chiropractors, Dr. Violet Long and Dr. John C. Masse, are "no longer with us." The form is signed by "Amanda Lorenz," whom Dr. Beutler identified as a Beutler-England employee with the authority to execute such a document.

The contracts that Drs. Beutler and England signed while partners in England-Masse included a clause that required the parties to arbitrate any dispute that "arises out of or is related to this Agreement." Focus based its motion to compel arbitration on these clauses, arguing that the subsequent correspondence from Beutler-England evidences its intent to ratify the England-Masse contracts. Beutler-England responded by arguing that it could not be bound by an agreement confected by a separate legal entity, the England-Masse partnership. In ordering that Beutler-England arbitrate its claims against Focus, the trial found that "Beutler-England had every intention of continuing the contract that both parties had previously entered into, [and] they actively, consciously pursued that agreement, . . . ."

In support of its opposition to arbitration, Beutler-England cites *Kincade v. Midroc Oil Co.*, 33,858 (La.App. 2 Cir. 9/27/00), 769 So.2d 813, *writ denied*,

10

00-3243 (La. 2/16/01), 786 So.2d 98, a case that we find distinguishable. In *Kincade,* the court refused to enforce an agreement confected during the existence of a partnership against a corporation that was formed after the partnership's termination, notwithstanding that many of the former partners were investors in the new entity, citing La.Civ.Code art. 2828, which provides: "When a partnership terminates, the business of the partnership ends except for the purposes of liquidation." However, the court in *Kincade,* 769 So.2d at 818, recognized a jurisprudential exception that may have applied, had the plaintiff been able to prove that "the subsequent corporation merely carried on the business" begun by the partnership. Additionally, the *Kincade* court was not presented with evidence that the subsequently-formed corporation intended to ratify the contract executed by the original partnership.

At trial, Dr. Beutler testified that England-Masse stopped doing business on a Friday in October of 2002, and on the following Monday, she and Dr. England began operating as Beutler-England, with the only change in the partnership being that Dr. England was no longer a partner. In February of 2003, Beutler-England notified Focus of the change in the company's name, its new tax identification number, and that two chiropractors were no longer practicing with the company. This information was faxed on a "Provider Update" form generated by Focus indicating that it listed the information on each provider as contained in Focus' computer system and that any corrections to that information should be made in the space provided. At least five times on the form faxed to Focus, the name "England-Masse" is crossed out and is replaced with "Beutler-England."

BLACK'S LAW DICTIONARY (4th ed. 1968) defines "ratification" as "[i]n a broad sense, the confirmation of a previous act done either by the party himself or by

11

another; confirmation of a voidable act." The definition continues to include: "The adoption by one, as binding upon himself, of an act done for his benefit, although done under such circumstances as would not bind him except for his subsequent assent." We can only conclude that Beutler-England's purpose in completing the "Provider Update" form was to continue the participation in the Focus network that England-Masse had begun in 2000. Beutler-England informed Focus that its name should be substituted for England-Masse's in its computer provider listing, and the basis of that listing was the England-Masse contract. As such, we decline to disturb the trial court's ruling ordering arbitration of Beutler-England's claims based upon the England-Masse contract.

Another issue presented is whether Beutler-England's claims for statutory damages under La.R.S. 40:2203.1(G)[5] is beyond the scope of the arbitration clauses in the contracts executed by Drs. Beutler and England because those clauses, unlike the contracts pertaining to Dr. Gunderson, provide that "the arbitrators *will have no authority to award any punitive or exemplary damages*, . . . ." (Emphasis added.) [6]

In *Pacificare Health Systems, Inc. v. Book*, 538 U.S. 401, 402, 123 S.Ct. 1531, 1533 (2003), the United States Supreme Court considered a similar argument in deciding whether claims for treble damages under the Racketeer Influenced and

---

[5]Under La.R.S. 40:2203.1(G) (emphasis added):

> Failure to comply with the provisions of Subsection A, B, C, D, or F of this Section shall subject a group purchaser to *damages payable to the provider of double the fair market value of the medical services provided, but in no event less than the greater of fifty dollars per day of noncompliance or two thousand dollars, together with attorney fees to be determined by the court.* A provider may institute this action in any court of competent jurisdiction.

[6]The arbitration clause in the contract signed by Dr. Lopez, whose claims are discussed below, provides that the arbitrators "shall have no authority to award any punitive damages, . . . ." Because of the similarity in language in both sets of agreements, the discussion of this issue as to Beutler-England applies to Dr. Lopez as well.

12

Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, should be submitted to arbitration "notwithstanding the fact the parties' arbitration agreements may be construed to limit the arbitrator's authority to award damages under that statute." The arbitration agreements in *PacifiCare Health Systems, Inc.*, 538 U.S. at 405, 123 S.Ct. at 1535 (alteration in original), included language that "punitive damages shall not be awarded [in arbitration]"; that "[t]he arbitrators . . . shall have no authority to award any punitive or exemplary damages"; and that "[t]he arbitrators . . . shall have no authority to award extra contractual damages of any kind, including punitive or exemplary damages . . . ." The plaintiffs argued that these provisions precluded an award of treble damages in arbitration, but the Supreme Court found that was not yet clear, given various jurisprudential definitions of treble damages and "the ambiguous terms of the contracts" at issue. *Id.* Noting, first, those cases in which treble damages under RICO were held to have compensatory and remedial purposes in addition to punitive objectives and, second, "the uncertainty surrounding the parties' intent with respect to the contractual term 'punitive,'" the Supreme Court concluded it could not yet determine how the arbitrators would construe the remedial limitations in the arbitration clauses. *Id.* at 406; 123 S.Ct. at 1535. Accordingly, it held that the proper course was to compel arbitration.[7]

We find the Supreme Court's reasoning in *PacifiCare Health Systems, Inc.* to be persuasive here. The arbitration agreements signed by Drs. Beutler, England, and Lopez are substantially similar to those found by the Supreme Court to be ambiguous and reflective of the parties' uncertain intent as to the meaning of "punitive," and

---

[7]In so holding, the Supreme Court stated: "Given our presumption in favor of arbitration, we think the preliminary question whether the remedial limitations at issue here prohibit an award of RICO treble damages is not a question of arbitrability." *PacifiCare Health Systems, Inc.*, 538 U.S. at 407; 123 S.Ct. at 1536, n. 2 (citation omitted).

there is yet no jurisprudence discussing whether the "double damages" of La.R.S. 40:2203.1(G) would fall within a contractual provision prohibiting "punitive damages."[8] As in *PacifiCare*, these uncertainties require these questions to be arbitrated, given the presumption in favor of arbitration. Accordingly, we decline to exercise our supervisory jurisdiction as to the claims of Beutler-England and to those of Dr. Lopez relating to this issue.

*Dr. Lopez*

In September of 2001, Dr. Lopez executed a "Provider Group Participation Agreement" with an entity known as MetraComp, Inc. ("MetraComp") in which he agreed to arbitrate "any disputes arising out of or which is related to their business relationship." That agreement also contains the following paragraph:

> 9.2  Assignment. *METRACOMP may assign all or any of its rights and responsibilities under this Agreement to any entity controlling, controlled by or under common control with METRACOMP*. GROUP [Dr. Lopez] may not assign any of its rights and responsibilities under this agreement to any person or entity *without prior written consent of METRACOMP*, which consent shall not be unreasonably withheld.

(Emphasis added.)

In November of 2001, the parent companies of Focus and MetraComp merged. According to the affidavit of Virginia Ross, Focus' director of provider relations, Focus immediately began to phase out MetraComp as an independent entity and to integrate its provider network with that of Focus. In January of 2004, MetraComp was dissolved as a Louisiana corporation.

---

[8]In its opposition to supervisory writs, Focus contends that these arbitration clauses (Beutler-England and Dr. Lopez) amount to a waiver of punitive damages in any forum. However, given the Supreme Court's characterization of similar language as ambiguous, this, too, is unclear and is a question to be decided by the arbitrators.

Dr. Lopez does not dispute that MetraComp had the right to assign its interest in the contract, nor does he argue that the trial court's conclusion that a valid assignment occurred is manifestly erroneous. Rather, he contends that the trial court erred in ordering him to arbitrate with Focus based upon the Lopez-MetraComp agreement when he never received notification that MetraComp assigned its rights under the contract to Focus.

In ordering the parties to proceed to arbitration, the trial court gave several reasons in rejecting Dr. Lopez's argument regarding lack of notice. First, the trial court found that the authority cited by Dr. Lopez requiring notice of assignment in certain instances did not apply to the present case, which does not involve a monetary debt, a security interest, or a lessor-lessee relationship. Second, the trial court concluded that the contract provided for a waiver of any such notice. Finally, the trial court considered that Dr. Lopez had been dealing with Focus throughout much of the time that the contract had been in effect since 2001.

We find no error in the trial court's analysis. The contract permits MetraComp to assign its interest therein to certain entities, while at the same time requires Dr. Lopez to obtain MetraComp's consent should he wish to assign his contractual rights to another. When these provisions are read together, they clearly permit MetraComp to assign the contract without notice under certain circumstances. Even if Dr. Lopez had cited legal authority that such notice is non-waivable, and we are not convinced that he has, his ongoing relationship with Focus, as evidenced by his receipt of Explanations of Benefits (EOB) referencing the Focus network dated as early as 2002, indicates that such notice was given. We decline to disturb the trial

15

court's ruling ordering the arbitration of Dr. Lopez's claims against Focus based upon the MetraComp contract.

## Decree

For the above reasons, the writ application filed by Dr. Gunderson, Beutler-England, and Dr. Lopez is denied, and the judgment appealed from is affirmed. Costs of the appeal in 05-1129 are assessed to Defendant/Appellant, Focus Healthcare Management, Inc.

**WRIT DENIED; JUDGMENT AFFIRMED.**