David P. PAETZOLD, Respondent,

v.

AMERICAN STERLING CORPORATION and American Sterling Bank, N.A., Appellants.

No. WD 68168.

Missouri Court of Appeals, Western District.

March 4, 2008.

Lynn McCreary, Kansas City, for Appellant.

Kelly McClelland and Jerome Patience, Liberty, for Respondent.

PAUL M. SPINDEN, Judge.

This dispute concerns the enforceability of an arbitration provision in an employment severance agreement between David P. Paetzold and his former employer, American Sterling Bank, N.A. When Paetzold sued the bank and its holding company, American Sterling Corporation, for breach of contract and fraudulent misrepresentation, American Sterling [1] moved to stay the circuit court proceedings and asked the circuit court to compel arbitration of Paetzold's claims. The circuit court denied American Sterling's motion. Pursuant to Section 435.440.1(1), RSMo 2000, and 9 U.S.C. Section 16(a)(1)(B) (1999), American Sterling sought this court's im-

---

1. We will refer to American Sterling Bank, N.A., and American Sterling Corporation collectively as "American Sterling."

mediate review. We reverse the circuit court's decision and remand for further proceedings.

After American Sterling hired Paetzold during 1994, Paetzold served as the bank's president, director, and vice-chairman of its board of directors. On May 21, 1999, American Sterling entered into a written severance agreement with Paetzold after terminating his employment on April 20, 1999. Paetzold agreed to provide, until December 31, 1999, reasonable assistance to American Sterling in retaining bank customers and to provide, "in response to litigation, regulatory or other matters," information regarding loans and investments he had made during his employment. Paetzold agreed not to solicit the bank's current or former customers on behalf of a commercial bank or savings and loan or to engage in the "business and related services of commercial banking" within five or fewer miles from each of the three branches of the bank until April 30, 2000. Paetzold also agreed not to disclose, at any time, confidential and proprietary information related to the bank, including information concerning current and prospective customers, financial and payroll matters, the bank's plans for marketing, and its organizational structure. In return, American Sterling agreed to pay Paetzold, in addition to severance compensation and other benefits, eight annual payments of $125,000, beginning on his 55th birthday and ending when he turned 62 years old, provided Paetzold had not breached any of the agreement's provisions.

On October 6, 2006, Paetzold filed this lawsuit. He claimed that American Sterling had breached the severance agreement by not making the first two $125,000 payments due him. Paetzold also claimed that American Sterling had fraudulently misrepresented its intention to make the payments.

American Sterling responded to Paetzold's lawsuit by filing a motion asking the circuit court to stay the proceedings and to compel arbitration. American Sterling noted that the severance agreement contained an arbitration clause that said, "You acknowledge and agree that any dispute regarding the application, interpretation or breach of this Agreement will be subject to final and binding arbitration before the American Arbitration Association . . ., which will be the exclusive remedy for such claim or dispute." The circuit court denied American Sterling's motion without explanation, and American Sterling appeals.

▆▆▆▆ Whether or not the circuit court should have granted American Sterling's motion to stay the proceedings and to compel arbitration is an issue of law that we review *de novo*. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 856 (Mo. banc 2006). American Sterling contends that Paetzold's claims for breach of contract and fraudulent misrepresentation fall within the scope of the arbitration clause in the severance agreement, and the clause is enforceable under the Federal Arbitration Act (FAA).[2] Paetzold counters that Missouri, rather than federal, law applies and that the clause is unenforceable because it did not contain language required under the Missouri Uniform Arbitration Act.[3]

▆▆▆▆ We first consider which act applies to the arbitration clause in the severance agreement-the FAA or the Missouri Uniform Arbitration Act. "The FAA applies to [arbitration] contracts evidencing transac-

2. The United States government has codified the FAA at 9 U.S.C. Section 1, *et seq.* (1999).

3. The General Assembly codified the Missouri Uniform Arbitration Act at Section 435.350, *et seq.* RSMo 2000.

tions 'involving commerce.'" *McIntosh v. Tenet Health Systems Hospitals, Inc.,* 48 S.W.3d 85, 88 (Mo.App.2001) (quoting 9 U.S.C. Section 2).[4] The phrase, "involving commerce," is "broad" and is the "functional equivalent" of the phrase, "affecting commerce," a phrase that "signals Congress' intent to exercise its Commerce Clause powers [enunciated in U.S. CONST. art. I Section 8] to the full." *Allied–Bruce Terminix Companies v. Dobson,* 513 U.S. 265, 273–74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The United States Supreme Court called for "broad interpretation" of the phrase to facilitate the FAA's "basic purpose [of putting] arbitration provisions on ' "the same footing" ' as a contract's other terms." *Id.* at 275, 115 S.Ct. 834 (citation omitted).

The arbitration agreement in *Dobson* involved interstate commerce only indirectly. During 1987, Steven Gwin and his wife entered into a lifetime protection plan with Terminix to protect their Birmingham house from termites. The Gwins purchased the plan from Terminix's Birmingham franchisee, Allied–Bruce. When the Gwins sold their house during 1991 to the Dobsons, Allied–Bruce inspected the house and declared it to be free of termite infestation. When the Dobsons took possession of the house, they found it to be swarming with termites, which had done significant damage to the house. Pursuant to the plan purchased by the Gwins, Allied—Bruce endeavored to repair the damage, but the Dobsons were not satisfied and sued Allied—Bruce and Terminix in Alabama state court. Allied—Bruce and Terminix asked the court to enforce the arbi-

tration provision agreed to by the Gwins, but the Alabama court refused and instead applied state law prohibiting enforcement of arbitration agreements. In considering the matter on appeal, the Supreme Court of Alabama ruled that the FAA did not apply to the contract because the Gwins had not contemplated getting involved in an interstate transaction. The court reasoned that "the connection between the termite contract and interstate commerce was too slight" and that the FAA should apply only to contracts in which the parties "contemplated substantial interstate activity." 513 U.S. at 269, 115 S.Ct. 834 (quoting the decision of the Supreme Court of Alabama). Although Allied–Bruce and Terminix purchased treatment and repair materials from out of state, the Alabama court found that the parties " 'contemplated' a transaction that was primarily local and not 'substantially' interstate." *Id.*

In rejecting the Alabama court's interpretation in favor of a "commerce in fact" test, the United States Supreme Court read the "[FAA]'s language as insisting that the 'transaction' in fact 'involv[e]' interstate commerce, even if the parties did not contemplate an interstate commerce connection." *Id.* at 281, 115 S.Ct. 834. The high court noted that Terminix and Allied–Bruce were multi-state firms and that Allied–Bruce used termite treatment and repair materials shipped from out of state; therefore, the contract involved commerce in fact. *Id.* at 282, 115 S.Ct. 834.

■ We, therefore, conclude that the FAA applies to all arbitration agreements

---

**4.** 9 U.S.C. Section 2 says, "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

that fall within the United States Congress' power to regulate interstate commerce. Because the Supreme Court in *Dobson* equated the reach of Congress' power to any agreement that affects interstate commerce, *Dobson's* effect was to extend the FAA's reach even to "intrastate activities of a very small scale" if those activities *"might* affect commerce when combined with similar small scale activities." J. NOWAK, R. ROTUNDA, and J.N. YOUNG, CONSTITUTIONAL LAW 154 (1978) (parsing the phrase, "affecting commerce") (emphasis added).

Indeed, this court's Eastern District has recognized that "[f]ederal courts have interpreted ["involving commerce"] broadly [by] applying the FAA in cases where the contract simply relates to interstate commerce even when the relationship was less than substantial." *McIntosh,* 48 S.W.3d at 88. Drawing upon this standard, the *McIntosh* court held that the FAA applied to require arbitration of a drug counselor's wrongful termination and breach of contract claims against his former employer, a hospital. At the start of his employment with the hospital, the drug counselor had signed an employee acknowledgement form agreeing to arbitrate any claims related to his employment or its termination. In determining whether or not the contract related to interstate commerce, the court noted that the hospital, through its substance abuse treatment program, "treats out-of-state patients, receives goods and services from out-of-state vendors, and receives reimbursement from out-of-state and multi-state insurers" and that "McIntosh's employment as a drug counselor facilitated and affected [the hospital]'s business activities." *Id.* The court deemed this activity—although "tangential"—to have sufficient effect on interstate commerce to "subject[ ] the arbitration agreement to the FAA." *Id.*

The relationship to interstate commerce in this case is similar to the relationship at issue in *McIntosh.* American Sterling has offered financial products to customers throughout the United States since at least 1999. It has serviced residential and commercial loans to customers living in other states, made and evaluated investments of its own assets in securities, including investments transacted with lending institutions in Kansas and other states, and operated under federal regulations for banking institutions.[5] Paetzold's employment as American Sterling Bank's president, director, and vice-chairman of the board of directors necessarily facilitated and affected these interstate business activities.[6]

5. Michael D. Thompson, chairman, president, and chief operating officer of American Sterling Corporation, and the vice-chairman of American Sterling Bank, set out these facts about the interstate nature of American Sterling's business activities in an affidavit. Paetzold argues that we should disregard the affidavit because Thompson stated in it, "I either have first-hand knowledge of the matters and things stated in this Affidavit or have learned them in the course of my business." Paetzold contends that any information Thompson learned in the course of his business must be hearsay and, because Thompson did not delineate which statements were based on first-hand knowledge and which were based on information he learned in the course of his business, the entire affidavit is inadmissible hearsay. We need not decide whether or not all of the statements in the affidavit were based on Thompson's personal knowledge. In light of the positions that he holds at American Sterling, Thompson's statements regarding the interstate nature of American Sterling's business activities constitute facts within his personal knowledge.

6. *See also Mueller v. Hopkins & Howard, P.C.,* 5 S.W.3d 182, 185–86 (Mo.App.1999), and *Duggan v. Zip Mail Servs., Inc.,* 920 S.W.2d 200, 202 (Mo.App.1996) (citing employees' dealings with customers outside of Missouri as a basis for finding FAA applied to arbitration clauses in employment agreements).

Paetzold contends, however, that American Sterling's interstate business activities and his participation in those activities are irrelevant because, unlike the arbitration agreement in *McIntosh*, the arbitration clause in his case was part of a severance agreement and not an employment agreement. Paetzold reasons that, because the severance agreement did not take effect until after his employment ended, the agreement did not involve his job duties or the bank's business activities.

This argument does not aid Paetzold. The severance agreement specifically provided for Paetzold to give, for approximately eight months after his employment ended, "reasonable assistance" to American Sterling "in retaining customers of the Bank, providing information regarding loans and investments made by [Paetzold] during [his] employment by the Bank in response to litigation, regulatory or other matters." [7] The agreement prohibited Paetzold from soliciting current or former customers on behalf of a commercial bank or savings and loan for one year after his employment ended, and it prohibited Paetzold from disclosing confidential and proprietary information about the bank or its customers at any time after his employment ended. Thus, the severance agreement provided for Paetzold to continue to perform duties facilitating and affecting American Sterling Bank's interstate business activities. The FAA applies to the arbitration clause in the severance agreement.

Paetzold also argues that the choice of law provision in the severance agreement required that Missouri law govern and, under Missouri law, the arbitration clause is unenforceable. Specifically, Paetzold contends that the arbitration clause in the severance agreement did not contain the notice of arbitration language Section 435.460 mandates.[8] We specifically rejected this argument in *Brookfield R–III School District v. Tognascioli Gross Jarvis Kautz Architects, Inc.*, 845 S.W.2d 103, 105–06 (Mo.App.1993) (holding that *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), prohibits denying arbitration of a contract subject to the FAA on the basis that the contract did not contain Section 435.460's notice of arbitration language). The arbitration clause in the severance agreement is enforceable.

The arbitration clause in the severance agreement required that arbitration be the "exclusive remedy" for any dispute over "the application, interpretation or breach" of the agreement. Paetzold's claims of breach of contract and fraudulent misrepresentation fall within the scope of the arbitration clause. The circuit court erred in denying American Sterling's motion to stay the proceedings and compel arbitration. Therefore, we reverse the circuit

---

**7.** Paetzold contends that American Sterling never asked him to provide assistance with customers or bank business after his employment ended and, in fact, American Sterling never contemplated his assistance. The plain meaning of the severance agreement's language contradicts this argument. Whether American Sterling requested Paetzold's assistance or Paetzold provided his assistance goes to the issue of performance of the agreement and not to whether or not the agreement "evidenc[ed] a transaction involving commerce" under 9 U.S.C. Section 2.

**8.** Section 435.460 provides, "Each contract subject to the provisions of sections 435.350 to 435.470 shall include adjacent to, or above, the space provided for signatures a statement, in ten point capital letters, which read substantially as follows: 'THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.'"

court's judgment, and we remand the cause to the circuit court to enter a judgment sustaining American Sterling's motion to stay the proceedings and compel arbitration.

VICTOR C. HOWARD, Chief Judge, concurs.

## CONCURRING OPINION

RONALD R. HOLLIGER, Judge, concurs in a separate opinion.

I concur in the majority opinion, which necessarily and accurately follows U.S. Supreme Court precedent in the interpretation of the Federal Arbitration Act. It is a discomforting concurrence, however, to all those who have historically seen in the various states a residual power to regulate activities within their own states according to their own policies and principles of law. The all encompassing interpretation and application of the Federal Arbitration Act through the Commerce Clause is in the process of engulfing the original concept of federalism upon which our system of government was founded. At oral argument, counsel for the bank stated that there would be some situations that would not be potentially covered by federal rather than state law regarding arbitration. Yet he couldn't think of any. Nor can I.